Filed 12/10/20  P. v. Mireles CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FRANK MIRELES,<br><br>    Defendant and Appellant. | F077349<br><br>(Fresno Super. Ct. No. F12905015)<br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is hereby ordered that the opinion filed herein on November 24, 2020, be modified as follows:

1.      On page 3, in the second sentence of the third paragraph, the word stepdaughter is replaced with daughter so that the sentence now reads:  Rodriguez shared custody of his 18-year-old stepson and 12-year-old daughter with Ms. Perez.

This change requires modification of all subsequent references to stepdaughter to daughter.

2.      All references to stepchildren shall be modified to children.

3.      All references to stepfather shall be modified to father.

Except for the modifications set forth above, the opinion previously filed remains unchanged.  This modification does not effect a change in the judgment.

POOCHIGIAN, J.

WE CONCUR:

HILL, P.J.

SMITH, J.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FRANK MIRELES,<br><br>Defendant and Appellant. | F077349<br><br>(Fresno Super. Ct. No. F12905015)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Kimberly A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

Appellant and defendant Frank Mireles was charged and convicted of murdering his friend, Jose "Tony" Rodriguez, after stealing property from his house, and his conviction is supported by substantial evidence. On July 6, 2012, Rodriguez's family found his body lying on the floor of the den in his house, just four hours after they had left him. Rodriguez had been repeatedly hit in the head with a ball-peen hammer and died from multiple blunt force injuries. The bloody hammer that contained Rodriguez's DNA was found hidden between the mattress and box spring in the master bedroom.

Rodriguez's neighbor reported that defendant Frank Mireles, a mutual friend, was the last person seen at the house as Rodriguez's family left. A short time after Rodriguez was murdered, defendant drove to his brother's home, and his girlfriend saw him throw a bag into a trashcan; the bag contained property taken from Rodriguez's house. Defendant and his girlfriend returned to their apartment, and defendant threw away his blood-stained pants and shoes in a garbage dumpster; Rodriguez's DNA was on the pants and shoes. The dumpster also contained more of Rodriguez's property. The day after the murder, defendant went to the "Gold Rush" store and sold jewelry taken from Rodriguez's house.

When defendant was initially questioned by the police, he said everything was fine when he left Rodriguez's house, and he did not know who would kill him. After he was arrested for the murder, defendant claimed Rodriguez gave him some property to try and sell for him. He said he briefly left Rodriguez's house and found Rodriguez's body when he returned. He claimed to hear people talking in the house and fled and threw away his bloody clothes and some of the property Rodriguez gave him to sell because he did not want to get involved.

Defendant was charged and convicted of first degree felony murder based on residential burglary, with a felony-murder special circumstance also based on burglary. He was sentenced to life in prison without the possibility of parole.

On appeal, defendant argues his conviction for first degree felony murder and the felony-murder special circumstance must be reversed because of insufficient evidence of burglary, since he was invited into Rodriguez's house, and there was no evidence he intended to steal anything when he entered the house. Defendant further argues the court failed to give the required instructions on the felony-murder special circumstance, and the instructions that were given violate the federal and state Constitutions.

We will order the parole revocation fine stricken and otherwise affirm.

## FACTS

Tony Rodriguez and his former wife, Angie Perez, lived in separate homes and had a good relationship. Rodriguez shared custody of his 18-year-old stepson and 12-year-old stepdaughter with Ms. Perez. The children regularly stayed with Rodriguez at his house in Sanger.

Rodriguez's house had a master bedroom, a separate bedroom for his stepdaughter, and a den. When the children stayed with him, Rodriguez slept in the den so that his son could use the master bedroom. The house also had a "backroom" that was like a workshop, where Rodriguez stored things in plastic containers and boxes stacked up in the room. Rodriguez usually hung around with his friends in the backroom/workshop.

Rodriguez was going to turn the back room/workshop into a bedroom for his stepson. However, Rodriguez was having financial problems and was afraid he was going to lose his house.

Steven Camacho and his grandfather lived next door to Rodriguez. Camacho and Rodriguez were good friends and often got together at each other's homes.

About two years before the homicide, Rodriguez introduced Camacho to defendant. Camacho, Rodriguez, and defendant became friends and hung out at each other's homes. Camacho and Rodriguez never had any problems with defendant. Ms. Perez and the children knew defendant and that he was Rodriguez's friend.

3.

Javier Harvey Davila, Rodriguez's friend and another neighbor, also knew defendant. Davila occasionally used methamphetamine with Rodriguez and defendant. Davila testified Rodriguez had sold methamphetamine in the 1990s, but he was not selling drugs at the time of the murder. Davila testified that shortly before the homicide, Rodriguez said he was getting tired of defendant showing up at his house all the time.

Davila had known defendant since they were in school, and they worked together at a lumber company. Davila testified defendant had a temper and got mad easily, based on experiences when they worked together. Defendant lost his job when he crashed a forklift into a garage door and failed a drug test. Defendant had financial problems and lost his house.

Camacho testified that at the time of the homicide, defendant was going through a divorce. He was looking for a job and was having financial problems; he lost his house and needed to find another place to live. Defendant was living with his girlfriend in Visalia.

## THE DAY OF THE HOMICIDE

Rodriguez's two stepchildren spent the night of July 5, 2012, at Rodriguez's house. On the morning of July 6, 2012, they had breakfast together. Rodriguez went into the backyard and started to mow the lawn. Rodriguez was meticulous about keeping up the house and yard. The stepson testified Rodriguez always put away the lawnmower when he was finished with it. Both children testified no one came to the house while they were with Rodriguez. Camacho noticed Rodriguez's stepchildren were at Rodriguez's house.

Around 1:00 p.m., Rodriguez sent a text message to his brother-in-law that said: "… I might have [to] get out of here sooner than I thought so I'll be talking to you about

4.

leaving some things over there just till I get back on my feet if it's okay?" His brother-in-law replied, "No prob."[1]

## Defendant arrives at Camacho's house

Also, on July 6, 2012, defendant called Camacho and asked if he could stop by his house to use his computer to look for a job. Defendant said he also wanted to see Rodriguez, but he could not reach him. Camacho called Rodriguez and told him that defendant wanted to see him, but defendant was going to hang out at Camacho's house first.

Sometime around 3:00 p.m., defendant parked a white pickup in front of Rodriguez's house and went into Camacho's house. Defendant was wearing a black T-shirt, blue jeans, and running shoes.

Camacho testified that while defendant was at his house, defendant charged his cell phone, used the computer, and asked Camacho if he could borrow $20 for gasoline. He also asked whether Camacho could get him a line or two of crystal methamphetamine. Camacho testified that he used to deal drugs and served time, but he was not involved in that anymore and told defendant he could not help him. As for the money, he told defendant that he had to check his wallet and see how much he had. Camacho and defendant got along fine, and they did not argue.

## Defendant goes to Rodriguez's house

Camacho testified that after defendant had been at his house for about one hour, he told defendant to leave. Camacho explained a friend was going to drive over and take Camacho on some errands, and he had to clean up. Camacho believed that it was around

---

[1] Defendant later claimed that Rodriguez was packing up boxes in his backroom/workshop that day and worried about what to do with his possessions when he moved out of his house. Defendant said he offered to help him sell the items, and Rodriguez gave him some jewelry and loaded some boxes from the backroom/workshop into defendant's truck.

5.

4:00 p.m. when defendant took his cell phone, left Camacho's house, and walked to Rodriguez's house.

Just three or four minutes after defendant left, Camacho was about to get into the shower when defendant called and asked if he left his keys there; Camacho said no.[2] Camacho testified defendant asked him not to leave on his errands until they talked again, because defendant needed to borrow money for gasoline to get home. Defendant said he was going to try to get the money from his brother.

**Ms. Perez picks up the children**

It was also around 4:00 p.m. when Ms. Perez arrived at Rodriguez's house to pick up the children because they planned to see a movie in Fresno. She sent a text message to the children that she was there and waiting in her car. The two children left Rodriguez's house and got into their mother's car. Rodriguez went outside and talked with Ms. Perez through her open car window.

In the meantime, Camacho finished his shower, and his grandfather gave him a message that Rodriguez wanted to talk to him. Camacho went outside to look for Rodriguez. Camacho saw Ms. Perez's car, and Rodriguez was leaning into the window and talking to her. Camacho also saw defendant standing on the front porch of Rodriguez's house.[3] Camacho tried to get Rodriguez's attention to ask what he wanted. Rodriguez held up his hand and indicated he wanted to keep talking to Ms. Perez. Camacho went back into his own house.

---

[2] At trial, Camacho testified defendant asked if he left his charger at the house and not about his keys. However, Camacho told an officer that defendant called about his keys.

[3] The officer who interviewed Camacho after the homicide testified that Camacho never mentioned that he saw defendant standing in front of Rodriguez's house when Rodriguez was talking with Ms. Perez.

6.

After Ms. Perez and Rodriguez talked, Ms. Perez drove away and took the children to the movie theater in Fresno. Ms. Perez and the children testified they did not see anyone else at the house when they left.

At 4:29 p.m., Rodriguez sent a text message to Ms. Perez that she looked nice, referring to when he saw her; she replied thanks. Rodriguez did not send any more messages from his phone.

**Defendant leaves Rodriguez's house**

Camacho testified he was inside his house and saw Ms. Perez drive away. Defendant called him again and said he did not need to borrow money anymore. Camacho did not hear any screaming or yelling from Rodriguez's house.

At 4:55 p.m., Rodriguez's stepdaughter sent a text message to Rodriguez's cell phone and said she was at the movie theater. He did not reply.

Sometime before 5:30 p.m., Camacho was still inside his house when he heard the sound of defendant's truck starting. He looked outside and saw the white truck leaving the area.

At 5:30 p.m., after defendant left in his truck, Camacho's friend arrived, and Camacho went on errands with her.

At 5:31 p.m., Rodriguez's brother sent a message to Rodriguez's cell phone and asked where he was. Rodriguez did not respond.

At 7:23 p.m., defendant sent a text message to Rodriguez's cell phone that he would stop by tomorrow. There was no reply.[4]

**Rodriguez's children discover his body**

Around 8:00 p.m., Ms. Perez left the movie theater and drove the children back to Rodriguez's house in Sanger. At 8:15 p.m., the stepdaughter sent text messages to

---

[4] Defendant later admitted that he knew Rodriguez was dead when he sent this text message.

7.

Rodriguez to tell him that they were on their way back. Rodriguez did not respond, and that was not normal for him.

When Ms. Perez arrived at Rodriguez's house, the family noticed there were no lights on outside, which was unusual. The children got out of the car, the stepson unlocked the front door, and they went inside. Ms. Perez waited in her car because the stepson was going to get his things and stay overnight with her. She also wanted to make sure everything was okay.

The stepdaughter testified she went into the house and it was also dark inside. She went into the den, found Rodriguez lying on the floor, and saw blood. She yelled for her brother to help. He went into the den and realized Rodriguez was not moving. They both yelled at Rodriguez to wake up, but he did not respond.

Ms. Perez testified the children had been in the house for about two minutes when the stepdaughter ran out; she looked scared. The stepdaughter said Rodriguez was on the floor and he was not responding. Ms. Perez ran into the house and found Rodriguez lying on the floor of the den. There was blood all over his face and the floor. She tried to take his pulse, and realized his body was cold, and he was dead. She told her son to take his sister outside, and she called 911. She noticed the curtains were closed in front of the den's sliding glass door, and the door was locked.

**The initial investigation**

Around 8:38 p.m., paramedics received a dispatch to respond to Rodriguez's house. When they arrived, they found Ms. Perez and the distraught children outside. The paramedics entered the house and confirmed Rodriguez was dead. Officers from both the Sanger Police Department and Fresno County Sheriff's Department also arrived. A paramedic reported that Rodriguez was dead and appeared to have been beaten with a hammer.

The officers asked Ms. Perez if there was anything unusual about the house. Ms. Perez said the backdoor was open two to three inches, and the window in the stepdaughter's bedroom was also open.

**The murder scene**

Rodriguez's body was lying in a pool of blood on the floor of the den. There was blood spatter emanating from Rodriguez's head. There was one area directly above his head where there was no spatter, that indicated something might have been in the way of the blood spatter, but it had been removed. There was a large amount of blood and spatter on the den's floor, a couch, and other objects in the room.

Rodriguez was still in possession of his wallet and cell phone.

There were no lights on in the den, but the television was on. There were two water bottles in the den.

There were drops of blood in the kitchen, by the kitchen sink, the bedroom hallway, the hallway wall, a blanket in the master bedroom, and what appeared to be blood on the window of the stepdaughter's bedroom, consistent with someone walking into those areas and leaving blood behind. The window was open in stepdaughter's bedroom; she said she had not opened the window.

A loaded .380-caliber handgun was on top of a china cabinet in the dining room, and two magazines of ammunition were in the kitchen.[5]

A lawnmower was in the middle of the backyard. It appeared as if someone had stopped mowing the lawn and left it there.

A trash can on the back patio contained a cigarette butt and a pack of Marlboro cigarettes. There were cigarette butts inside a can of beer in the backyard, and ash on top

---

[5] Ms. Perez testified the handgun belonged to Rodriguez, and he also kept a rifle in the house. The investigation did not connect the gun to defendant or the homicide in any way.

of the can.  The police found five Marlboro cigarette butts on the curb in front of Rodriguez's house, where Camacho had seen defendant's truck parked.

Camacho and Ms. Perez testified Rodriguez did not smoke cigarettes.  Camacho testified defendant smoked menthol cigarettes that were either Marlboro or Newport brands.

## Rodriguez's fatal injuries

Rodriguez was killed from blunt force injuries to his head, consistent with being hit with a hammer.  He had a skull fracture in the center of his forehead.  There were depressed skull fractures inflicted with great force in the right and left temporal bone areas, and the back portion of the head above the ear.  The force used to inflict the skull fractures resulted in lacerations and bleeding inside the brain.

There was dried blood on Rodriguez's face and head, and trauma all around his face.  There were lacerations on the forehead by the eyebrows, in the frontal scalp, and the back portion of the head.  There was noticeable bruising on the left forearm, and in the webbing between the fingers of his left hand.  The pathologist testified these injuries were not consistent with defensive wounds against a hammer.

The pathologist testified there was methamphetamine in Rodriguez's blood at "pretty significant levels."

## THE INVESTIGATION

## Camacho calls defendant

Camacho testified he ran errands for about 45 minutes and then returned to his house.  He saw Ms. Perez's vehicle parked in front of Rodriguez's house, and realized she had returned with the children.  Camacho went into his house without talking to them.  Within five minutes, Camacho heard a commotion, looked outside, and saw police cars and an ambulance.

10.

Camacho went outside and asked Ms. Perez what was wrong. Camacho testified Ms. Perez was crying and said Rodriguez could not wake up and he was "gone." Camacho realized Rodriguez was dead.

Ms. Perez asked Camacho if he saw anyone at the house that day. Camacho said defendant was the only person he saw at Rodriguez's house. Camacho gave a statement to the police that defendant was at Rodriguez's house earlier that day.

Camacho testified that once he realized Rodriguez was dead, he called defendant since he was the last person who he saw at Rodriguez's house. Defendant answered and it sounded like he was in a car. Camacho told defendant, " '[T]hey just found Tony murdered in his house.' " Defendant replied, " 'Huh? What? I can't hear you. Let me call you back. I've got to charge my phone,' " and hung up.

Camacho waited 10 to 15 minutes and defendant did not call back. Camacho again called defendant and told him that Ms. Perez found Rodriguez's body, and the paramedics were there. Camacho testified defendant did not act shocked, surprised, or show concern. They talked for a few minutes and then hung up.

Javier Davila testified that on the night of July 6, 2012, he learned from his brother that Rodriguez had been killed. On the morning of July 7, 2012, defendant sent a text message to Davila that he had a new cell phone and gave him the number. Davila used the new number and called defendant. Defendant asked Davila if he heard what happened. Davila said yes. Defendant said, " 'That's messed up what happened.' " Defendant asked Davila if he heard Rodriguez had been waiting for someone at the house. Davila said he did not know because he had not talked to Rodriguez that day. Davila testified defendant began to throw up and ended the call.

**Initial arrest of defendant**

Based on Camacho's information, the detectives determined defendant was a possible person of interest. They obtained defendant's cell phone number, but they did not know where he lived. On July 7, 2014, a search warrant was obtained to "ping"

11.

defendant's cell phone to obtain the GPS coordinates for his location. The cell phone pinged at an apartment complex in Visalia.

Around 6:00 p.m. on July 7, 2014, Detective McInerney called defendant's cell phone and asked if he would meet with him at the Sanger Police Department because he was conducting an investigation. McInerney did not mention Rodriguez's homicide. Defendant agreed and said he would be there at 10:00 p.m. McInerney offered to send a car, but defendant said he had a ride. Defendant's apartment in Visalia was about one hour away from the police department in Sanger.

Detective McInerney sent an undercover team to defendant's apartment complex in Visalia to watch for any movements. At 9:45 p.m., defendant had not arrived at the police department. McInerney instructed the officers to look for defendant.

At 9:55 p.m., the officers found defendant at the apartment complex, sitting in the driver's seat of a vehicle with his girlfriend and a small child. They determined defendant and his girlfriend lived in the complex. Defendant was taken into custody because of outstanding traffic warrants and transported to the Sanger Police Department.

**Defendant's first interview**

On the evening of July 7, 2012, Detective McInerney and Corporal Coles conducted a recorded interview with defendant at the Sanger Police Department that lasted for four hours, with several breaks.

Defendant was advised of the *Miranda*[6] warnings and agreed to answer questions. Defendant said he knew that Camacho had told the police he was at Rodriguez's house, and he was "waiting by the phone" for the police to call because he was anxious to talk about it.

Detective McInerney asked defendant if he had anything to do with Rodriguez's death. Defendant said no, and that Rodriguez was a good friend. McInerney asked if he

---

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

12.

knew or suspected who did it. Defendant again said no, and that everybody liked Rodriguez. Defendant said he was close to Rodriguez because they were both divorced and losing their homes.

Detective McInerney said that he had defendant's cell phone records. Defendant said he sent a text message to Rodriguez, and McInerney replied that Rodriguez was already dead by that time. Defendant said he did not know that.

Detective McInerney asked defendant why he was at Rodriguez's house. Defendant said he went there to give Rodriguez and Camacho his new phone number, but he got "stuck" there longer than planned. Defendant said he told Rodriguez about his new number, then went to Camacho's house and also gave the number to him. He charged his phone at Camacho's house because he did not have a charger, but it took a while. He left around 5:00 p.m. for his brother's house in Reedley and was late meeting his girlfriend.

Defendant said that as he was leaving Camacho's house, he could not find his keys. He told Camacho not to leave until he checked with him because he might need a ride if he could not find the keys. Defendant went to Rodriguez's house to look for the keys. Ms. Perez arrived, and defendant and Camacho waited outside while Rodriguez talked to her. Ms. Perez and the children left, and Rodriguez went back into his house. Defendant went to his truck to look for his keys and heard Rodriguez whistle. Defendant went to the gate and Rodriguez threw his keys to him. Defendant drove away, and Rodriguez was watering his back lawn when he left.

Detective McInerney told defendant that his girlfriend said that while they were driving back from Reedley, defendant pulled over to the side of the road and cried because Rodriguez was dead. Defendant said his girlfriend was confused, and he had told her that Rodriguez had been crying with him. Defendant said he found out that Rodriguez was dead later, when Camacho called him.

13.

Detective McInerney advised defendant that he was telling a different story compared to the accounts given by his girlfriend and Camacho, that he was the last person to see Rodriguez alive, and he left Rodriguez's house around the time of his death. Defendant said he was not involved in the murder. Rodriguez was watering his back lawn when he left and said he was waiting for "Polly" to come by.

Defendant said Rodriguez was heartbroken and depressed during their visit because he had to move out of his house in about four months. Defendant "could see him putting a bullet to his head" or "cutting his wrist" and "committing suicide."

Defendant said he heard about the killing from Camacho and Davila, and that Rodriguez had been beaten with a sharp object or weapon and a couple of people may have done it.[7] Detective McInerney asked defendant when he talked to Davila. Defendant said he called him that morning, they got choked up, and the call ended. They talked again on another call about what happened. Davila said he heard from Rodriguez's ex-wife that it was a homicide, and it looked like a couple of people did it. Camacho also told him that Rodriguez was beaten with some kind of metal object.

Detective McInerney asked defendant to tell him every detail of his visit to Rodriguez's house. Defendant said he went there to give his phone number to Rodriguez and Camacho. He first went to Rodriguez's house and his stepdaughter opened the door. Defendant gave Rodriguez the new number, and then he went to see Camacho and got stuck there. Defendant's brother called and said he needed his truck back, and his girlfriend sent a text asking where he was.

Defendant said he left Rodriguez's house around 5:00 p.m., and he was sure it was before 5:30 p.m. He visited his mother and his children, and then stopped at a gas station to fill up the truck and get something to drink. The gas was too expensive, so he went to

---

[7] There is no evidence that either Camacho or Davila told defendant how Rodriguez was killed.

14.

another gas station.[8]  He then headed to his brother's house in Reedley, left the truck there, and his girlfriend picked him up, and they ran errands.

Detective McInerney asked defendant what he talked about with Rodriguez. Defendant said when he first got to Rodriguez's house, he met Rodriguez's stepdaughter who said Rodriguez was in the back.  Defendant went to the back patio and talked with Rodriguez, who was sad and started to cry because he had to move out of his house in four months.  Rodriguez got a telephone call, so defendant went to Camacho's house and gave him the new phone number and used his phone charger.

Defendant said he went back to Rodriguez's house because he was concerned about him.  Rodriguez was upset because he was going to lose his house.  Defendant said he went through the same thing and advised Rodriguez to "just get rid of everything.  Do yourself a favor and get rid of everything."  Rodriguez showed defendant some furniture and other items in the den, and asked defendant what he should sell and how much he could get.

Defendant said he again told Rodriguez to "get rid of all this stuff" since he was going to move into an apartment and "start all over again, start new," which is what defendant had to do.  Defendant told Rodriguez to sell his recliner on Craig's List and Rodriguez agreed.  Defendant then left and went back to Camacho's house, and stayed longer than he planned.  He got messages from his brother's wife to return the truck immediately.  He could not find his keys.  He looked around Camacho's house, and then went to Rodriguez's patio and looked around.  Rodriguez's former wife arrived, and defendant waited while Rodriguez talked to her.  Defendant talked with Camacho, and then he went to his truck to look for the keys.  After his ex-wife left, Rodriguez said he was waiting for "Polly" to arrive, and they were going to meet in the alley because Polly

_____

[8] The officers reviewed the videotapes from security cameras at the two gas stations named by defendant and could not see defendant or the truck at those locations at the times indicated by defendant.

15.

was married, and Rodriguez did not want his daughter to know he was seeing anyone. Defendant said Rodriguez met Polly when they worked together at Gong's Market.

Detective McInerney asked defendant if he understood why he was a suspect. Defendant said he did, but that Rodriguez had two groups of friends. Defendant and Davila were one group, and he also had a younger group of friends. Defendant said Rodriguez wanted to beat up or kill the man who his ex-wife was seeing. Rodriguez also wanted "to smuggle drugs into the guys [*sic*] car." Defendant told him not to do anything stupid.

Detective McInerney asked defendant when he activated his new phone. Defendant said it was the day before yesterday. McInerney asked about his text messages. Defendant said he accidentally deleted the messages.

Detective McInerney asked defendant if they would find blood if they searched the truck and apartment. Defendant said no, gave permission for the search, and said he had nothing to hide. When asked about his clothes, defendant said he was wearing the same sneakers as when he was at Rodriguez's house.[9]

When asked if he smoked, defendant said he used to smoke Marlboros, but he quit a week ago and was chewing nicotine gum.

The interview ended in the early morning hours of July 8, 2012. Detective McInerney advised defendant that he was not being arrested for murder, but he would receive a citation for the traffic warrant, and he would be released from custody. However, McInerney warned defendant that "[t]his ain't over." Corporal Coles advised defendant that they would find out if he lied to them.

At trial, the prosecution played the entire recording of the interview for the jury. While there were several breaks during the four-hour interview, the recording device

---

[9] Defendant had already thrown away his bloody sneakers in a garbage dumpster at his apartment.

16.

continued to run. During one of the last breaks, defendant was alone in the interview room and was recorded as he said to himself: " 'Oh, f[**]k, I can't do drugs like this.' "

## THE ARREST OF DEFENDANT

### Search of defendant's apartment

On July 8, 2014, after the interview with defendant, the officers obtained a warrant and searched the apartment in Visalia where defendant and his girlfriend lived. There was a torn receipt in a trashcan from "Gold Rush Stores." The officers seized a clean pair of jeans from a dresser drawer.

The apartment complex's garbage dumpster contained a pair of Converse sneakers and a pair of blue jeans. The jeans were the same size as the pair found inside defendant's apartment. The shoes had blood spatter and bloodstains on them, and the jeans had blood spots on both legs.

A black bag was also found in the dumpster, and it contained an Optimus digital camera, an Olympus digital camera, a portable DVD player, a camera battery charger, and electronic cables.

The officers examined the cell phone that belonged to defendant's girlfriend. There were eight calls and multiple text messages between defendant and his girlfriend beginning at 5:40 p.m. on July 6, 2012.

### The Gold Rush receipt

Later, on July 8, 2012, an officer went to the "Gold Rush" kiosk in the Visalia Mall to investigate the torn receipt found in the trash at defendant's apartment. A Gold Rush employee testified the store paid cash for gold, silver, and platinum items. According to the store's records, defendant sold four items of gold jewelry to the store on July 7, 2012, the day after Rodriguez was killed, and the store paid him $74.21. The store obtained defendant's thumbprint and signature on the sales document, and he was required to show identification before the sale was completed. The officer recovered the four items of gold jewelry that defendant sold to the store.

17.

**Recovery of Rodriguez's property**

Defendant's girlfriend was interviewed and said that she drove to Reedley to pick up defendant at his brother's house on July 6, 2012, after he returned his brother's truck. She saw defendant throw a Walmart bag into a trashcan outside of the brother's house.

After receiving the report from the girlfriend, an officer searched the trashcan at the brother's house in Reedley. He found a coffee can that contained a set of keys with a handwritten tag that said, "Tony's keys." The officer also found a plastic Walmart bag in the trashcan that contained a grey case, lottery tickets, a pink watch, some silver bracelet links, a remote device for an alarm, a gold heart ring, a pendant with purple crystals, and a Leatherman all-purpose tool.

**Identification of Rodriguez's property**

Rodriguez's family examined the property recovered by the police from the Gold Rush store, the garbage dumpster at defendant's apartment, and the trash can at his brother's house.

Ms. Perez and the children recognized gold hoop earrings that belonged to the stepdaughter, a Raider's key chain that belonged to Rodriguez, personal family photographs, some silver links from a bracelet Rodriguez gave to Ms. Perez, his Leatherman multi-task tool, used lottery tickets, a talking wrist watch, and Rodriguez's pager. Rodriguez kept these items in the backroom/workshop.

Ms. Perez also recognized a camera and a portable DVD player that was taken from Rodriguez's backroom/workshop. She did not recognize the other camera. Ms. Perez identified a wireless remote device that controlled the alarm system at Rodriguez's house. Ms. Perez and her son recognized a badge from Gong's Market where Rodriguez used to work.

Ms. Perez and her son identified Rodriguez's handwriting on the key chain tags. The stepdaughter identified a ring with the word "Baby" engraved on it that belonged to her, that defendant had sold to the Gold Rush store. She also identified a gold heart ring,

a broken ring with an owl that she gave to her stepfather to fix, a Nintendo Game Boy that belonged to her stepfather, and her broken pink "PowerPuff" watch that she also gave to her stepfather to fix.

**The bloody ball-peen hammer**

On July 9, 2012, Rodriguez's family contacted the police and reported they found something in the house. An officer returned to Rodriguez's house and found a ball-peen hammer in the master bedroom that had been hidden between the bed's mattress and box spring. The hammer's handle was 13 inches long, and it had a six-inch head. There were bloodstains on the head. Rodriguez's family did not recognize the hammer as something that belonged to him.

**The blood evidence**

The red stains on the shoes and jeans found in the dumpster behind defendant's apartment, and the hammer found under the mattress in Rodriguez's house, tested positive for blood. The DNA from these bloodstains matched Rodriguez's DNA.

The Vasquez family lived down the alley from Rodriguez's house. On July 7, 2012, Mr. Vasquez checked the trash bin in the alley behind his house for some parts and did not notice anything special. On July 9, 2012, the Vasquez family contacted the police and reported they had again looked in the trash bin and found a shirt that appeared to have blood stains on it.

The stains on the shirt found in the dumpster tested positive for blood, but the blood type was not matched to anyone, and the DNA did not match defendant or Rodriguez. The stains on a black T-shirt found in defendant's apartment were negative for blood.

A water bottle found in Rodriguez's back yard contained fingerprints of both defendant and Rodriguez. The stains on the stepdaughter's bedroom window curtain were negative for blood.

**Defendant's arrest and his second statement**

At 6:30 p.m. on July 9, 2012, the police arrested defendant for Rodriguez's murder. Defendant initially said he wanted an attorney, but later changed his mind and agreed to answer questions. Detective McInerney and Corporal Coles again conducted the recorded interview.

Defendant said he did not kill Rodriguez but admitted he was in the house right after it happened. Defendant again said Rodriquez talked about selling some of his belongings, including furniture and his gun, and asked defendant to help him. Rodriguez put some things into defendant's truck and said he was waiting for someone to come by, but he would have a few more things to sell.

Rodriguez got a telephone call and defendant decided to get something to drink. Defendant said he left the house but did not explain where he went. When defendant returned, he knocked on the front door, but no one answered. Defendant walked into the backyard and noticed the back door was "wide open." Defendant thought that Rodriguez was meeting someone in the alley and waited on the back patio.

Defendant said he eventually went into the house and found Rodriguez lying in the den. He ran to Rodriguez and "picked him up and I heard something a mumbling or a whispering and I got scared and I freaking ran." Defendant heard voices from Rodriguez's backroom/workshop and hid in a closet. Defendant then ran back to his truck and left.

Detective McInerney asked defendant why he left his friend lying on the ground when he was wounded or dead. Defendant said he did not call 911 because Rodriguez was dead. He was afraid since "they were still in the house," and he heard "talking" in the dining room.

Detective McInerney told defendant they found his clothes with blood spattered on them. Defendant said his clothes got bloody "when I grabbed his hand" and "picked him up." When he heard the voices in the house, "I let go of him and I got blood on my face,

20.

splattered on my face." McInerney asked why he got rid of his clothes. Defendant said he threw his bloody clothes and shoes in the dumpster because he did not want to get involved. McInerney asked why he acted like a suspect by leaving his friend on the ground, running away, and destroying evidence. Defendant said he did not want to be a suspect. McInerney said that did not make sense.

Detective McInerney asked defendant why he lied about everything in their prior conversation. Defendant again said he did not want to be involved. McInerney asked why he did not tell the truth if he was innocent. Defendant replied that he felt guilty about leaving Rodriguez on the floor.

Defendant repeatedly said he did not kill Rodriguez. Detective McInernery said all the evidence pointed to him because he had Rodriguez's property and sold Rodriguez's gold jewelry. Defendant said he never sold Rodriguez's gold jewelry because it was worthless, but Rodriguez asked him to see how much it was worth. McInerney told defendant they had the receipt from the gold sale. Defendant said that he sold his own gold. McInerney replied the store gave the gold jewelry to the police, and they also found the other property he took from Rodriguez's house.

Defendant said he had Rodriguez's property because he was supposed to sell the items to help him move. He threw everything away because Rodriguez was dead and he "didn't want to be part of it…." Defendant questioned why he would throw away Rodriguez's property "if I'm gonna rip him off…."

Defendant said he should have called 911 instead of hiding in the closet. Detective McInerney said he was still lying to them about what happened. Defendant said he did not kill Rodriguez, he tried to help him that day, and felt he abandoned him because he was hiding in the closet. He was ashamed of himself.

Detective McInerney asked defendant where he got rid of Rodriguez's property. Defendant did not answer the question, and the interview ended.

21.

## DEFENSE EVIDENCE

Defendant's brother, sister, and niece testified that he was a good person and not violent. None of his family members knew he used methamphetamine. Each testified that they would be surprised to know defendant had not helped a friend who was hurt or dying and lied to the police.

Detective Eric Grijalva searched the pickup truck that belonged to defendant's brother, and that defendant used on the day of the homicide. The truck was dusty and there were no apparent blood smears.

## Defendant's trial testimony

Defendant testified that at the time of the homicide, he was living with his girlfriend and unemployed. On the morning of July 6, 2012, he went to a "temp agency" because he was supposed to get trained for a new job, but it fell through. He started cleaning out some of the property he had moved into the apartment after losing his house. He sold some of his own property at a pawnshop for $30.

Defendant testified he was using his brother's truck since he thought he was going to get a new job. He just had to return it at the end of the day. Defendant drove to Rodriguez's house because he wanted to give his new cell phone number to Rodriguez. Around 2:00 p.m., he parked in the street in front of Rodriguez's house. Rodriguez's stepdaughter met him at the front door and said Rodriguez was in the backyard.

As defendant headed for the backyard, he saw Rodriguez walking up the driveway. They walked into the backyard and sat on the patio. Defendant asked if he had a charger for his phone; Rodriguez said no. Rodriguez was "kind of sad" and did not appear like himself. He was trying to do yard work, but he was also packing boxes so he could move out. After a while, Rodriguez invited defendant into the house. There were a lot of boxes in the backroom/workshop that were packed and ready to be shipped out because Rodriguez had to move out of the house. Defendant testified he had been to Rodriguez's house many times and had never seen the boxes in the backroom.

22.

Defendant suggested that Rodriguez get rid of and sell things he did not need. Rodriguez had defendant look at some couches, a recliner, and a gun that he could sell. Rodriguez offered him a bottle of water, and defendant took one from the refrigerator.

Defendant said they went outside, and defendant again encouraged him to get rid of things instead of packing them. Rodriguez's children were in the house while they talked. Defendant testified he did not smoke cigarettes because he had just quit that week.

Defendant testified Ms. Perez arrived to pick up the children. Rodriguez went into the front yard and talked with her in her car. Defendant walked to the front of the house, and Camacho came over and stood on the porch with him. Defendant asked Camacho if he could use his charger for his cell phone because he did not bring one with him. Camacho agreed and defendant went to Camacho's house.

About 20 minutes later, defendant went back to Rodriguez's house. He left his phone at Camacho's house because it was still charging. Rodriguez was really depressed. They looked through the boxes in the backroom/workshop. Defendant testified he told Rodriguez, " 'You know what, I have my brother's truck here now. If you want to throw them in the back of the truck, we can take them somewhere. We can go, you know, do something. You can get rid of them. You just can't be waiting till the last minute.' "

Rodriguez agreed but then got a phone call. Defendant told Rodriguez to put his stuff in the truck. Defendant loaded some boxes and then went back to Camacho's house and got his cell phone. When defendant returned to Rodriguez's house, Rodriguez had put six or seven boxes into the truck. Defendant's brother called and told him that he had to immediately return the truck. Defendant told Rodriguez that his plans had changed, he had to return the truck, and Rodriguez had to remove the boxes.

Rodriguez took all the boxes out of the truck, but he asked defendant if he could sell a gold ring that said "Baby" on it. Rodriguez said there was a grocery store in Sanger

where a guy bought jewelry. Defendant told Rodriguez to come with him. Rodriguez said he could not leave because he had to wait for someone at the back of the house.

Defendant was about to leave but could not find his keys. He went back to Camacho's house and could not find them. Defendant testified he never asked Camacho for money that day but told him not to leave until he found the keys. Rodriguez found the keys and tossed them to defendant. Defendant said he would be right back and left in the truck. Defendant testified he went to the grocery store and found the guy who bought jewelry. He only offered $11 so defendant did not sell the ring.

### *Defendant finds Rodriguez's body*

Around 5:00 p.m., defendant returned to Rodriguez's house. He went into the backyard and knocked on the door. No one answered, and he thought Rodriguez was in the alley to meet someone. He thought he saw a car in the alley through the fence. He waited on the patio for about 10 minutes. He looked through the screen door and saw Rodriguez lying in the den. Defendant went in the house, and there was blood everywhere. Defendant touched Rodriguez's hand and tried to pick him up. He realized Rodriguez was dead. He got blood all over his hands and face and tried to "flick" off the blood.

Defendant testified he heard voices mumbling and whispering from the backroom, where Rodriguez "had all the boxes at." Defendant was scared and thought they would see him as they left, and he would be "next." He went into a hallway closet to hide. After about 10 minutes, he thought the other people were gone. He went back into the den, checked Rodriguez again to see if he was alive, left through the back door, and got into his truck. Defendant testified he did not take any property from Rodriguez's house, and he forgot he still had the gold ring in his pocket.

### *Defendant throws away Rodriguez's property and his bloody clothes*

Defendant drove directly to his brother's house in Reedley, where he met his girlfriend. Defendant realized that a box of Rodriguez's property was in the cab of his

truck. He threw the items away at his brother's house without looking at them. His girlfriend drove him back to their apartment in Visalia. He changed and threw his bloody clothes and shoes in the apartment's dumpster. Camacho called and told him Rodriguez was dead. Defendant pretended not to know because he did not want to get involved and thought he could be next.

Defendant was sorry he did not call 911 when he found Rodriguez's body, but he had left his phone in the truck. It never occurred to him that the stepdaughter would find her stepfather's body. He admitted he used his phone several times once he got back into his truck.

### *Cross-examination*

Defendant conceded he lost his job because he failed a drug test. He lied in his previous statements to the police in 2012, when he said he was laid off and had been unemployed for six months; he had really been out of work since 2010. His girlfriend thought he was working at the time of the homicide, but he lied to her and did not tell her that he was not working. Defendant also admitted he never told the police or any of his attorneys that he had been at a "temp agency" on the morning of the homicide, and he never obtained any documents to confirm it.

Defendant admitted that he used methamphetamine, but he only used drugs a few times and never with Rodriguez. However, he had seen Rodriguez use drugs.

Defendant also admitted that he repeatedly lied to the police during his pretrial interviews about what he did that day, when he last saw Rodriguez, that he went to two gas stations after he left Rodriguez's house, and that he was wearing the same shoes as when he last saw Rodriguez. He failed to previously disclose that he helped Rodriguez move boxes into his truck or that he tried to sell the gold ring for him.

Defendant initially testified that after he dropped off the truck at his brother's house in Reedley, he did not tell his girlfriend that Rodriguez was dead. He later admitted he told her that Rodriguez was dead as they returned to Visalia.

25.

Defendant denied that he asked Camacho for money that day. Defendant admitted he talked to Camacho before he left Rodriguez's house, but that was only to tell him that he found his keys and Camacho could leave.

Defendant admitted he sent a text message to Rodriguez a few hours after he knew he was dead, but he could not remember why he did that.

Defendant agreed the cigarette butts found at Rodriguez's house were the same type of Marlboros that he used to smoke. He had stopped smoking the week before the homicide and was not carrying cigarettes with him that day.

Defendant testified that when he decided not to sell Rodriguez's gold "baby" ring at the grocery store, he put it in his pants pocket. Defendant admitted he sold some items to the Gold Rush store the day after the homicide. He initially testified he only sold his own property. On cross-examination, defendant admitted that when he changed his clothes after finding Rodriguez's body, he moved the ring from the pocket of his bloody jeans to his clean clothes. Defendant admitted he sold Rodriguez's gold ring to the Gold Rush store and kept the money. Defendant claimed he just emptied his pockets and sold the contents at Gold Rush and did not realize he still had Rodriguez's ring. He signed the receipt but did not pay attention to the receipt's itemized list. Defendant admitted he failed to tell this story in his prior statements to the police.

Defendant was asked if the ball-peen hammer used to kill Rodriguez looked familiar. He testified: "I gave Tony a lot of tools. [I]t looks familiar like something that I gave him, you know, a year ago, a year before that happened. I gave him a toolbox full of old rusted tools and hammers and screwdrivers. It looked like something I gave him way back." He knew Rodriguez kept his tools and the boxes in his backroom/workshop.

## REBUTTAL

Ms. Perez was recalled and testified she had lived in Rodriguez's house for 15 years when they were married. She testified that Rodriguez always kept boxes stacked in

26.

his backroom/workshop, in the same way as they appeared on the day of the homicide, and they had been there for months.

Rodriguez's stepdaughter was also recalled, and again, she testified that no one came to the house on the day of the homicide; she was there with just Rodriguez and her brother; and she never saw defendant. She testified Rodriguez always kept plastic containers and boxes stacked up in the backroom/workshop, and they had been there for some time.

Officer Manuel Chavez testified he booked defendant into custody on July 9, 2012, and defendant had a pack of cigarettes with him.

Detective Grijalva testified he interviewed defendant's brother and sister-in-law about defendant's use of their truck. They said defendant initially borrowed the truck on July 5, 2012, and asked if he could keep it another day. They agreed but told defendant that he had to return the truck to their Reedley home the first thing in the morning on July 6, 2012. However, defendant had still not returned the truck by 4:30 p.m. on July 6, 2012.

## PROCEDURAL BACKGROUND

On October 4, 2013, an information was filed that charged defendant with murder (Pen. Code, § 187),[10] with the felony-murder special circumstance that the murder was committed during the commission of first degree burglary (§ 190.2, subd. (a)(17)).

**The prosecutor's closing argument**

In closing argument, the prosecutor argued defendant was guilty of first degree murder, but clarified the People were not relying on premeditation, and there was no evidence defendant arrived at Rodriguez's house with the intent to kill him. Instead, defendant was guilty of first degree murder based on a felony-murder theory, that he was committing first degree residential burglary and stealing property when he killed

---

[10] All further statutory references are to the Penal Code unless otherwise stated.

27.

Rodriguez. "It was out of desperate need because [defendant] got caught stealing, and the evidence shows it."

The prosecutor referred the jury to the burglary instructions and explained that defendant could form the intent to steal after he was initially invited into Rodriguez's house, whenever he decided to take Rodriguez's property and entered the back room to steal. The prosecutor asserted defendant was unemployed, he needed money and drugs, and he was desperate.[11] Defendant saw an opportunity while he was on the back patio and Rodriguez was mowing the lawn. Defendant went into the house, and he had a few minutes to "get in, get out" and go "shopping" in Rodriguez's backroom, and started putting things in a bag. The prosecutor suggested that defendant had to quickly act in "a few stolen moments," and that explained the random nature of the items he took, which was "exactly like the property that a person who only has a few minutes to steal and get out, would just open up that bag and just start shoveling things in." He took small things that he could easily carry away, sort out later, and sell, instead of larger items that may have been more valuable. The prosecutor explained the value of stolen property was not an element for burglary, as long as defendant had the required intent to steal at the time of the murder.

The prosecutor argued the evidence suggested that while defendant was taking things from the back room, Rodriguez left the lawnmower in the yard and went into the house for some reason. Rodriguez discovered defendant was stealing from him, "and that's when it got very ugly very quickly," and defendant killed him.

> "[M]aybe [Rodriguez is] yelling at him, maybe he's calling him ugly names, and you only turn your back on someone you know, someone you trust. And it was then that the defendant took one of those hammers in that room, because you see that there are tools there, and he had to come after

---

[11] The prosecutor cited the recorded statements defendant made during a break in his first interview with the police, the day after the murder, when he was in the interview room and said to himself: " '… I can't do drugs like this.' "

and kill [Rodriguez] because now his world was falling apart. The fact that he'd been stealing, the fact that he didn't have employment, the fact that he had this drug issue, it was all coming to a head, and that's how that happened."

The prosecutor argued defendant repeatedly lied in his pretrial statements and trial testimony. Defendant claimed he left Rodriguez's house and went to two gas stations to fill up the truck, but the security videotapes from the gas stations refuted this story, and he testified at trial that he lied about it. Defendant claimed he talked to Rodriguez's stepdaughter when he was at the house, but Rodriguez's stepchildren testified no one else was at the house that day. Defendant claimed Rodriguez did not know what to do with all his boxes when he had to move out of his house, and asked defendant to help him sell his property. However, Rodriguez's family testified the boxes had been packed in the back room for months, and Rodriguez exchanged text messages with his brother-in-law about storing his property with him. Defendant claimed he had permission to take Rodriguez's property to sell it, but he took items that had not been in the boxes and threw away the property in the garbage can at his brother's house and the dumpster at his apartment. He sold Rodriguez's stepdaughter's ring the day after the murder and lied about it.

Defendant admitted he had lied to his girlfriend for months about having a job. Defendant even tried to make the police think that Rodriguez wanted to kill himself or plant drugs on his ex-wife's new boyfriend, which were also lies.

The prosecutor argued the jury could determine defendant's intent "not by his words, but by his actions in this case, by the property and the outcome because [Rodriguez] is dead. And it doesn't make sense that it was some masterful drug dealer that [Rodriguez] owed money" to, that no one had ever mentioned in over five years between the murder and the trial, was the killer. The prosecutor pointed to the blood evidence on defendant's pants and shoes that showed spatters on his clothing consistent with the murder scene. "If the defendant was simply just touching the victim like he said

29.

he did, then there's no reason to have any kind of spatter or moving blood on his clothes." The spatter on his clothes and shoes was consistent with the blood moving onto his body "because the hammer was moving."

**Defense counsel's closing argument**

Defense counsel argued defendant was not a violent person. Rodriguez's family knew they were friends, defendant could not have done that to his friend, and he never had any disputes with Rodriguez. Defense counsel acknowledged defendant had repeatedly lied, he was his "own worst enemy," and he threw away his bloody clothes because he did not want to get involved. However, defendant could not be convicted of murder just because he lied. "This whole case boils down to [defendant] didn't call 911, so he's a murderer. That's where all the lies stem after that. Well, he's your good friend, why didn't you call 911? Because he's scared to death." Defense counsel stated defendant would have pleaded guilty to residential burglary if he had only been charged with that offense, but he was not guilty of murder just because he lied to the police.

Defense counsel argued the People's burglary/theft theory was inconsistent with the things that defendant allegedly took, which included used lottery tickets, old keys, and other "trash," because there was nothing to sell. If defendant needed money, he left behind a gun and an X-box gaming console.

Defendant consistently said he was going to help Rodriguez move, and he told the truth about hearing voices in the house and becoming afraid. Defense counsel suggested that Rodriguez put the loaded gun on the cabinet after his stepchildren left because he was expecting "some rough customers and he found it."[12] Defense counsel described

_____

[12] In rebuttal, the prosecutor asserted that if Rodriguez was really afraid that someone was coming after him, he would have kept the gun with him in the backyard as he mowed the lawn. The prosecutor also refuted defense counsel's claim that Rodriguez was killed by a drug dealer since the murder weapon was Rodriguez's own hammer that was left at the scene. Defendant admitted he knew about the hammer since he gave it to

30.

Rodriguez's fatal head injuries as looking like "a Mafia-style gang hit" because he was "massacred." Counsel asserted the bruise on Rodriguez's hand was "massive" and a defensive injury because he was fighting for his life. Defense counsel criticized the criminal investigation because the officers did not find the bloody hammer under the mattress even though there was blood on the blanket, and they did not look in the hall closet to see whether defendant trailed blood inside when he was hiding.

Defense counsel argued that it did not matter if Rodriguez's stepchildren did not remember that defendant had been at the house that day since they were probably not paying attention. Counsel cast doubt on the family's testimony that the boxes had been stacked in the backroom for months, since Rodriguez's stepdaughter probably did not pay attention, and his former wife did not live there anymore. Counsel also cast doubt on the reliability of the family's identification of certain jewelry recovered from the Gold Rush store and the property found in the dumpster.

**The instructions**

The jury was instructed on first degree murder and express and implied malice. It was also instructed on first degree felony murder based on residential burglary and the elements of residential burglary and theft.

The jury was instructed on second degree murder and voluntary manslaughter, based on either sudden quarrel or heat of passion, as lesser included offenses.

The jury was further instructed on consciousness of guilt based on false statements and suppression and fabrication of evidence; defendant's flight; and possession of recently stolen property as evidence of a crime.

---

Rodriguez, and he could not take the bloody weapon with him since he had his brother's truck.

31.

**Conviction and sentence**

On March 14, 2018, the jury convicted defendant of first degree murder, and found true the special circumstance that he was engaged in the crime of first degree burglary in the commission of the offense.

On April 13, 2018, the trial court sentenced defendant to life imprisonment without the possibility of parole. Defendant filed a notice of appeal the same day.

## DISCUSSION

## I.     Substantial Evidence of Felony Murder Based on Residential Burglary

Defendant contends his first degree murder conviction based on the theory of felony murder while committing residential burglary, and the felony-murder special circumstance, must be reversed because there is insufficient evidence to support the elements of burglary: that he "entered" a residence with the intent to commit theft or another felony.

Defendant argues he was invited to enter the residence of Rodriguez, who was his good friend, he did not trespass or break in, and there is no evidence he had any intent to steal when he arrived at Rodriguez's house.

### A.     *Substantial Evidence*

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – evidence that is reasonable, credible and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

" 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury

32.

to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Kraft, supra*, 43 Cal.4th at pp. 1053–1054.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio, supra*, 43 Cal.4th at p. 358.)

The same substantial evidence standards apply to true findings on a special circumstance allegation. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)[13]

### B.     Entry

Defendant's first argument is that the People failed to prove the "entry" element of residential burglary.

The elements of first degree residential burglary are (1) an unlawful entry into a residence (2) with the intent to commit a theft or any felony. (§§ 459, 460, subd. (a);

---

[13] We will further discuss the felony murder special circumstance in issues II and III, *post*.

33.

*People v. Anderson* (2009) 47 Cal.4th 92, 101; *People v. Sample* (2011) 200 Cal.App.4th 1253, 1261.)[14]

The defendant must enter one of the premises specified in section 459, which is not limited to houses, and includes any "*room* [or] apartment." (§ 459, italics added; *People v. Tafoya* (2007) 42 Cal.4th 147, 170–171; *People v. Magallanes* (2009) 173 Cal.App.4th 529, 535–536; *People v. Salemme* (1992) 2 Cal.App.4th 775, 781.)

The defendant's entry does not have to be forced or constitute a trespass to support a burglary conviction. (*People v. Frye* (1998) 18 Cal.4th 894, 954; *People v. Carter* (2005) 36 Cal.4th 1114, 1157.) "[A] person who enters for a felonious purpose may be found guilty of burglary even if he enters with the owner's or occupant's consent," provided the defendant does not have an unconditional possessory right to enter. (*People v. Frye, supra*, 18 Cal.4th at p. 954; *In re Andrew I.* (1991) 230 Cal.App.3d 572, 578.)

When the burglary is based on entry into a room within a house, the defendant's intent to steal may be "formed *after* entry to a building but *before* entering a room therein from which the defendant intends to steal property." (*People v. McCormack* (1991) 234 Cal.App.3d 253, 255–256, italics added.) "[A] defendant's entry into a bedroom within a single-family house with the requisite intent can support a burglary conviction if that intent was formed only after the defendant's entry into the house," which constitutes entry into a separate room for the purposes of section 459. (*People v. Sparks* (2002) 28 Cal.4th 71, 73; *In re M.A.* (2012) 209 Cal.App.4th 317, 321.) Thus, a burglary is committed "even when the defendant first forms the intent to enter a room inside a home to commit a felony *only after he has already entered the house without any felonious intent*." (*In re M.A., supra*, 209 Cal.App.4th at p. 321, italics added.)

"It is well settled that burglary of an inhabited dwelling house may be accomplished even if the specific room that the burglar unlawfully enters is not a space

---

[14] We will address intent in the next section.

where people live.  In determining whether the defendant has burglarized an inhabited dwelling house, '[t]he question is not whether the specific area is used for sleeping or everyday living, but whether the area is functionally interconnected to and immediately contiguous to the residence, which is used for sleeping or everyday living.'  [Citation.] ' " ' "Functionally interconnected" means used in related or complementary ways. "Contiguous" means adjacent, adjoining, nearby or close.' " '  [Citation.]"  (*In re M.A., supra*, 209 Cal.App.4th at pp. 323–324.)

A burglary can occur even if the defendant enters the room or house through an unlocked door.  (*People v. Elsey* (2000) 81 Cal.App.4th 948, 961, fn. 5.)  However, "the burglary of different unlocked rooms in a single-family residence constitute[s] a single burglary."  (*People v. Richardson* (2004) 117 Cal.App.4th 570, 575.)

### 1.    Analysis

Defendant argues the People failed to prove the "entry" element because he entered Rodriguez's house at the invitation of his "close friend," he was "always welcome in that home," and there was a reason for him to be there since he frequently visited the home.

It is not clear whether defendant had the intent to steal when he left Camacho's house and initially entered Rodriguez's house.  There was evidence that defendant frequently went to Rodriguez's house and was invited to visit.  As we have explained, however, section 459 provides that the requisite entry may occur into "any house, room" or other enumerated structure, and such entry does not have to be a trespass or involve the use of force.  While defendant was initially invited to enter Rodriguez's house, the circumstances of his initial entry are not dispositive.  Rodriguez may have given implied permission for defendant to walk around the backyard, enter the house, and go into some interior rooms, however, there is no evidence that defendant had an unconditional possessory right.

35.

We will discuss the evidence of intent below, but once defendant formed an intent to steal and then entered one of the rooms in Rodriguez's house to take his property, defendant's conduct satisfied the "entry" element of section 459, regardless of whether he had the intent to steal when he initially entered the residence. Based on the items taken from Rodriguez's house, defendant apparently entered the back room/workshop and perhaps the den to steal the items, those two rooms were part of Rodriguez's residence, and his entry into those rooms with the intent to steal satisfied the "entry" element of burglary.

## C.    *Intent*

Defendant's primary argument is there is insufficient evidence that he entered Rodriguez's house with the intent to steal, and his alleged intent was only based on speculation.

As explained above, when a residential burglary is based on entry into a room within a house, the defendant's intent to steal may be "formed *after* entry to a building but *before* entering a room therein from which the defendant intends to steal property." (*People v. McCormack, supra,* 234 Cal.App.3d 253, 255–256, italics added.) The defendant's intent to commit theft must thus exist at the time of that entry. (*People v. Sparks*, *supra*, 28 Cal.4th at p. 85, fn. 17; *People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 166; *People v. Waidla* (2000) 22 Cal.4th 690, 734.) "One may be liable for burglary upon entry with the requisite intent, regardless of whether … any felony or theft actually is committed. [Citation.]" (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540; *People v. Allen* (1999) 21 Cal.4th 846, 863, fn. 18.) If the underlying felony is theft or larceny, "the item of property need only have some intrinsic value, however slight. [Citations.]" (*People v. Martinez* (2002) 95 Cal.App.4th 581, 585.)

"[I]n reviewing the sufficiency of evidence to support a burglary finding, the requisite intent is rarely demonstrated by direct proof, and as a result, may be inferred from facts and circumstances. [Citation.] As a result, evidence such as theft of property

from a dwelling may create a reasonable inference that there was intent to commit theft at the time of entry. [Citation.]" (*In re Leanna W.* (2004) 120 Cal.App.4th 731, 741; *In re Matthew A.*, *supra*, 165 Cal.App.4th at p. 541; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245.)

The mere possession of stolen property will not alone support a conviction for theft of property; however, the possession of recently stolen property is so incriminating that only slight additional evidence is necessary to sustain a burglary conviction. The jury determines, in light of all the evidence, whether or not such an inference should be drawn. (*People v. McFarland* (1962) 58 Cal.2d 748, 754–755.)

Even if no crime was committed after entry, an intent to commit theft at the time of entry may be inferred from flight from the premises. (*People v. Smith* (1978) 78 Cal.App.3d 698, 704; *People v. Moody* (1976) 59 Cal.App.3d 357, 363; *People v. Martin* (1969) 275 Cal.App.2d 334, 339.) In addition, false statements to the police involving incriminating circumstances, or the fabrication or destruction of evidence, are relevant factors that may raise the inference of consciousness of guilt. (*People v. Burton* (2018) 29 Cal.App.5th 917, 925; *People v. Flores* (2007) 157 Cal.App.4th 216, 221; *People v. Wilson* (2005) 36 Cal.4th 309, 330.)

"Whether the entry was accompanied by the requisite intent is a question of fact for the jury. [Citation.] 'Where the facts and circumstances of a particular case and the conduct of the defendant reasonably indicate his purpose in entering the premises is to commit larceny or any felony, the conviction may not be disturbed on appeal.' [Citation.]" (*People v. Kwok*, *supra*, 63 Cal.App.4th at p. 1245.) A reviewing court's opinion that the circumstances might also be reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Lewis* (2001) 25 Cal.4th 610, 644; *People v. Kraft*, *supra*, 23 Cal.4th at pp. 1053–1054.)

37.

### 1. Analysis

Defendant asserts there is insufficient evidence that he had the intent to steal when he entered Rodriguez's house. Defendant argues his announcement to Camacho, that he was going to Rodriguez's house, was inconsistent with "having a stealthy intent to steal upon entering the house." Defendant contends there was no evidence that he entered the residence with the intent and plan to steal Rodriguez's property because the house was not ransacked, he only took property of minimal or no value, such as key rings and used lottery tickets, he only obtained a "small amount" of money from selling the ring, he threw away more valuable items like the camera, and he left behind other valuable items like the handgun and electronics.

We have already explained that defendant was not required to have the intent to steal when he initially entered Rodriguez's house, and that he was guilty of burglary if he formed that intent after he entered the house and thereafter went into one of the rooms with the intent to take Rodriguez's property. In addition, the defendant is not required to actually take any property, and the stolen property need only have some intrinsic value, even if that value is slight.

Even if defendant did not intend to steal when he initially entered Rodriguez's house, there is substantial circumstantial evidence that he formed that intent when he was inside the house and entered the backroom/workshop, and took certain property before he killed Rodriguez, based on the testimonial and physical evidence, and the inferences resulting from defendant's flight from the house, his possession of stolen property, his disposal and attempted destruction of incriminating evidence, his efforts to fabricate evidence, and his numerous false statements to misdirect the police about critical parts of the investigation.

The undisputed evidence showed that defendant was fired from his job for failing a drug test, he had been unemployed for months and lied to his girlfriend about it, he had lost his house, and he was in financial trouble. When he arrived at Camacho's house, he

asked for money and methamphetamine. Camacho declined both requests. Shortly after defendant left Camacho's house and walked to Rodriguez's house, he called Camacho and asked him not to leave until they talked again because he still needed money.

Rodriguez's stepchildren had stayed overnight, and they were at the house all day until their mother picked them up around 4:00 p.m. The children knew defendant, but they never saw him or anyone at their father's house before they left with their mother. Camacho testified that he saw defendant standing on Rodriguez's front porch as Rodriguez talked with Ms. Lopez through her car window, that was after the children were already in the car.

The record strongly implies that after Ms. Lopez and the children left, defendant went into the backyard with Rodriguez, based on the Marlboro cigarette butts found on the patio, identical to those found in the street where defendant had parked his truck. Camacho testified defendant smoked Marlboro cigarettes, and defendant admitted that at trial. Rodriguez's family testified their father did not smoke cigarettes. While defendant insisted he had quit smoking a week before the murder, there was physical evidence of Marlboro cigarette butts in the backyard and in front of the house where he parked the truck, and the booking officer testified defendant had a package of cigarettes when he was arrested.

Camacho further testified that he saw the white truck leave sometime before 5:30 p.m. Defendant called Camacho before he left and said he did not need money anymore.

Rodriguez's family identified the property found in the dumpster at defendant's apartment, the trash can at his brother's house, and recovered from the Gold Rush store. They testified certain items belonged to Rodriguez, Ms. Lopez, or his daughter. They also testified most of the stolen property had been in the backroom/workshop.

39.

While Rodriguez's family did not recognize the murder weapon, defendant confessed that he previously gave Rodriguez the ball-peen hammer and other tools, and he knew Rodriguez kept the hammer in the backroom/workshop.

Rodriguez's family testified he was meticulous about taking care of his property and always put away the lawnmower when he finished working in yard. The record strongly implies that Rodriguez was mowing the backyard lawn when something drew him into the house because the police found the lawnmower in the middle of the backyard lawn.

The pathologist testified that while there were some bruises on Rodriguez's arm, these injuries were not consistent with defensive wounds upon being confronted by a hammer, which implies that he was attacked by surprise or without warning. The pathologist testified there was noticeable bruising on the left forearm, and in the webbing between the fingers of his left hand. The pathologist testified these injuries were not consistent with defensive wounds against a hammer.

There was a great amount of blood at the murder scene in the den. There were blood drops that led from Rodriguez's body into the kitchen, down the hallway, and into the master bedroom where the murder weapon was hidden under the mattress. The window was open in the stepdaughter's bedroom, and the stepdaughter testified she had not opened it that day; also, the back door was open.

There is no evidence that the police found blood drops in the backroom/workshop, where most of the property was taken from. The absence of any blood evidence in the backroom/workshop, which was part of the house, is consistent with defendant going into that room to grab the hammer and whatever property he could before Rodriguez confronted him in the den, where he killed Rodriguez by fracturing multiple parts of his skull with the hammer.[15]

---

[15] At trial, defendant stated for the first time that Rodriguez asked him to sell his handgun, perhaps to explain the presence of the gun and ammunition on top of various

40.

At trial, defense counsel argued defendant could not be convicted of murder simply because he gave false statements to the police. However, defendant's conduct immediately after he left Rodriguez's house shows that he sought to destroy incriminating evidence and fabricate possible suspects, not simply to distance himself from Rodriguez but to create false trails for the police to follow. Shortly after he left, defendant sent a text message to Rodriguez's phone that he would drop by the next day, even though he knew Rodriguez was dead. When he dropped off the truck at his brother's house in Reedley, he threw away the Walmart bag that contained many of the items he had stolen from Rodriguez's backroom/workshop. When they arrived at the Visalia apartment, defendant changed and threw away his bloody jeans and shoes, and another bag of Rodriguez's property in the garbage dumpster. However, he held onto some of the jewelry, went to the Gold Rush store the next day, and sold the items for cash.

Shortly after Camacho learned from Ms. Lopez that Rodriguez was dead, he called defendant and told him that Rodriguez had been murdered. Defendant claimed he was having phone trouble, promised to call back, and hung up. He did not call back and Camacho called him again. Camacho testified defendant did not act shocked, surprised, or show concern. On the morning after the murder, defendant sent Davila his new cell phone number and Davila called him. Defendant asked if he knew what happened, and if he heard Rodriguez had been waiting for someone at the house. At that point, defendant had only talked to Camacho about the murder, and there is no evidence that Camacho

---

counters. Ms. Lopez testified the gun belonged to Rodriguez, and there was no evidence it was connected to the murder. Neither the children nor Ms. Lopez testified that Rodriguez ever left a loaded gun around the house. In addition, the children spent the entire day with Rodriguez, and never testified they saw a loaded gun that day. It is possible to infer from the record that defendant was in the process of taking the gun and ammunition from another part of the house when Rodriguez interrupted him.

41.

told defendant that Rodriguez was supposedly waiting for someone at the house. Instead, defendant was trying to place blame on some unknown party.

When Detective McInenery called defendant and asked to meet him for an interview, defendant promised to be at the police department at 10:00 p.m. and said he did not need a ride. Defendant's apartment was about an hour away from the Sanger Police Department. By 9:55 p.m., however, he had not appeared at the police station, and officers found defendant sitting in a car at his apartment complex. During that first interview, defendant spontaneously said he sent a text message to Rodriguez after he left the house, referring to the message that he had created as an alibi. Defendant also gave an account of his activities that was vastly different from Camacho's statement – that he went to the neighborhood just to give his new cell phone number to his friends, and not because he needed to use Camacho's computer to look for a job or he asked Camacho for money and drugs. Defendant further claimed he went to Rodriguez's house first and Rodriguez's stepdaughter greeted him, even though the stepdaughter testified she never saw defendant that day; he then went to Camacho's house; and fabricated the story that he stopped by two specific gas stations after he left, again to create an alibi. Defendant's story about the gas stations was refuted by the security videotapes from those businesses and defendant later admitted he lied about it.

Even during this first statement, defendant tried to fabricate additional evidence and told officers that Rodriguez was suicidal, he could see him "putting a bullet to his head," and Rodriguez wanted to beat up or kill his former wife's new boyfriend, or plant drugs in the man's car.

Defendant fabricated another story when he told the police that Rodriguez did not know what to do with his property when he had to move out of his house. However, defendant did not know that just a few hours earlier, Rodriguez had exchanged text-messages on this subject with his brother-in-law, who readily agreed that Rodriguez could store his property at his house.

42.

Defendant further claimed that as he left Rodriguez's house, he knew Rodriguez was waiting for a married woman to meet him. Defendant even asserted that Camacho and Davila told him that Rodriguez had been beaten with a sharp object, and a couple of people were responsible. There is no evidence that either Camacho or Davila had been given this information or, more importantly, that they made these statements to defendant.

Also, at the first interview, defendant told the officers that he was wearing the same tennis shoes as when he was at Rodriguez's house, even though he had already thrown away his bloody shoes. When asked if he smoked, defendant immediately claimed he had quit a week earlier, knowing that he had left Marlboro cigarette butts in Rodriguez's backyard and in front of the house.

After defendant was arrested, he gave another interview and claimed for the first time that Rodriguez said he was waiting for someone other than an alleged girlfriend to come by, defendant and Rodriguez loaded the boxes from the workshop into his truck so they could sell his property, and defendant realized he had to return the truck and told Rodriguez to unload the boxes. Defendant said he left to get something to drink, he found Rodriguez's body when he returned, and he heard voices in the house and was afraid, so he hid in a closet and then fled. When confronted with the fact that the police found his bloody jeans and shoes in the dumpster, defendant admitted he threw them away but claimed he accidentally got blood on him when he picked up Rodriguez's body. Defendant denied stealing anything from Rodriguez's house, claimed that one box of Rodriguez's property was still in the cab of his truck, and he threw everything away because he did not want to be involved. He admitted selling jewelry to the Gold Rush store but insisted everything belonged to him.

At trial, defendant's testimony raised further inconsistencies between his story and the trial evidence. Defendant again insisted Rodriguez's stepdaughter greeted him when he first arrived at Rodriguez's house, and the children were in the house while he talked

43.

with Rodriguez in the backyard. Rodriguez's stepchildren testified they never saw defendant or anyone else at the house before they left with their mother.

Defendant further testified that Rodriguez was both mowing the lawn and packing the boxes in the backroom/workshop that day. Defendant claimed he had never seen those boxes on his prior visits. Ms. Lopez testified she had lived in that same house when they were married, however, and those boxes had been in the backroom/workshop for months. Rodriguez's stepdaughter, who regularly stayed with her stepfather, also testified the boxes had been there for some time.

Defendant admitted at trial that he sold the ring that belonged to Rodriguez at the Gold Rush store but offered another version of events. This time, defendant claimed Rodriguez asked him to sell the ring to a guy who bought jewelry at the grocery store. Defendant found this guy, but the offer was not good enough, so he put the ring in his pocket. Defendant said he went back to Rodriguez's house and found his body in the den and forgot about the ring in his pocket. Defendant admitted he moved the ring from his bloody pants to his clean clothes when he changed, he sold several items of his own property at the Gold Rush store the next day, and he did not realize that Rodriguez's ring was included in the itemized sales list.

The entirety of the record thus provides substantial evidence to support defendant's murder conviction based on a felony-murder/burglary theory. Defendant needed money, he decided to take advantage of the opportunity to steal some things from the house while Rodriguez was mowing the backyard lawn, and he grabbed some small items from the backroom/workshop. While defendant insists that he took items of virtually no value, such as the used lottery tickets, a burglary conviction is supported even if the stolen property is of minimal value. Defendant took several things that he could have sold, such as the Leatherman multitask tool, a camera, a portable DVD player, and various items of jewelry. Defendant may have grabbed smaller items that he could easily get out of the house and thought would not attract Rodriguez's attention. After

44.

defendant fled, he obviously feared detection and threw away most of the stolen property but kept the smaller items of jewelry and sold them the next day.

Defendant argues the theft of Rodriguez's property from the back room/workshop was more consistent "with a panicked afterthought *after killing Rodriguez* than it is with a preplanned intent to steal valuable property because he needed money." (Italics added.)[16] This argument is refuted by defendant's own trial testimony, that the murder weapon was one of the tools he gave to Rodriguez, that Rodriguez kept the hammer in the backroom/workshop, and the absence of any blood trails or blood stains in the backroom/workshop, compared to the blood that was on defendant's shoes and pants and the blood stains and spots that were found through the rest of the house, shows he stole the hammer and the other property before he was confronted by Rodriguez in the den and fled.

Defendant asserts the evidence in this case is not as strong as relied on to support a felony-murder theory based on burglary in *People v. Letner and Tobin* (2010) 50 Cal.4th 99. In *Letner and Tobin*, the court held the convictions were supported by substantial evidence and explained:

> "[I]t is reasonable to infer from the circumstance that defendants committed these crimes that they possessed the intent to do so at the time they entered [the victim's] house. A rational juror reasonably could find that a purely social visit to a friend's house did not spontaneously lead to the attempted rape, robbery, and brutal murder of the hostess. The circumstance that [the victim] may have willingly invited defendants into her house is of no consequence. [Citation.] The circumstance that defendants apparently waited some period of time prior to attacking [the victim], during which the three of them consumed alcoholic beverages, could be viewed as an attempt to make defendants' task easier by reducing the possibility that [the victim] would be able to resist. Further, Letner's participation in the telephone calls with [two witnesses] could indicate he was not concerned whether

---

[16] In making this argument on appeal, defendant has apparently abandoned his trial theory that unknown third parties killed Rodriguez, and he simply had some of his property as part of their early plan to sell some things.

45.

they in turn eventually would inform the police he had been present in [the victim's] house, because he believed either that the person with whom [the victim] was speaking on the telephone when defendants first arrived knew that Letner was there, or that, if the police were to begin looking for him, he nonetheless would be able to escape to Iowa. Alternatively, the jury reasonably could find that Letner simply joined in the telephone calls in anger or on impulse, without reflecting upon the possible consequences. In sum, as we recently observed regarding a similar challenge, 'possession … of goods stolen from the victim's home shortly after the crimes is strong circumstantial evidence that [defendant] harbored the intent to commit larceny when he entered her home. [Citation.] Moreover, "[t]here is no better proof that [defendant] entered the [victim's house] with intent to commit robbery than a showing he did in fact commit robbery after his entry." [Citation.]' [Citation.] Accordingly, we conclude the evidence was sufficient to support the jury's finding that defendants committed a burglary and intentionally killed [the victim] while engaged in the burglary." (*Id*. at pp. 167–168.)

In reaching this holding, *Letner and Tobin* cited to *People v. Wallace* (2008) 44 Cal.4th 1032, 1060, which held "[t]he crime of burglary, however, requires only an entry *with the requisite intent*; the entry need not be accomplished by force. [Citations.]" Indeed, *Letner and Tobin* and *Wallace* describe the situation that is established by the extremely strong circumstantial evidence in this case – defendant entered Rodriguez's house by invitation, he formed the intent to steal at some point while he was there, he went into the backroom/workshop and took several things including the murder weapon, and Rodriguez left the backyard and confronted him in the den where defendant bludgeoned and murdered him. The fact that defendant did not take Rodriguez's property immediately upon his arrival does not prohibit his felony-murder conviction.

Although defendant testified that he did not enter the house or any room with the intent to steal, and presented the jury with his version of the events that blamed unknown third parties for the murder, the jury as the finder of fact was entitled to reject the defense theory given the numerous inconsistencies, his possession of stolen property, his concealment of his bloody clothes, and his attempts to fabricate evidence. The jury disbelieved defendant's story, and a rational jury could have found beyond a reasonable

doubt that defendant formed the intent to steal when he entered the backroom/workshop and took numerous items, including the ball-peen hammer, and then was confronted by Rodriguez and killed him. Our role on appeal is simply to determine whether the jury's findings are supported by substantial evidence. The record contains substantial circumstantial evidence supporting the jury's verdict on felony murder based on a burglary, and the jury's finding on the felony murder special circumstance.

## II. Special Circumstance Instructions

Defendant next contends the felony murder special circumstance must be stricken because the court failed to give any instructions on the special circumstance. As we will explain, the court's failure to give the requisite instruction was harmless beyond a reasonable doubt based on the entirety of the record.[17]

### A. The Instructions

As explained above, the jury was instructed with CALCRIM No. 540A on first degree felony murder based on residential burglary.

> "Now, the defendant is charged in Count One with murder under a theory of felony murder. To prove that the defendant is guilty of first-degree murder under this theory the People must prove beyond a reasonable doubt that, one, the defendant committed residential burglary, two, the defendant intended to commit residential burglary and, three, while committing ·the residential burglary the defendant caused the death of another person. A person may be guilty of felony murder, even if the killing was unintentional, accidental, or negligent. To decide whether the defendant committed residential burglary please refer to the separate instructions that I will give you on that crime. You must apply those instructions when ·you decide whether the People have proved first-degree murder under a theory of felony murder. The defendant must have intended

---

[17] Defendant did not object to the court's failure to give the special circumstance instructions, or to his claim in issue IV, *post*, that CALCRIM No. 376 reduced the People's burden of proof. Defendant's failure to object has not forfeited appellate review since the issues involve his substantial rights, and we need not address his alternate ineffective assistance argument. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503; *People v. Lopez* (2011) 198 Cal.App.4th 698, 708.)

47.

to commit the felony of residential burglary before or at the time he caused the death of another person.  The crime of residential burglary continues until a defendant has reached a place of temporary safety.  It is not required that the person die immediately as long as the act causing death occurred while the defendant was committing the felony."

The court also gave CALCRIM No. 540B on felony-murder liability as an accomplice who aided and abetted the commission of a residential burglary, and CALCRIM No. 410 on aiding and abetting.

The jury was further instructed on the elements of residential burglary and theft.

"Now, the defendant is charged in Count One, committing murder during the commission of a burglary, in violation of Penal Code Section 459.  To prove that the defendant committed the burglary the People must prove beyond a reasonable doubt that, one, the defendant entered a building or room within a building or a structure and, two, when he entered the building, room within a building, or the structure he intended to commit theft.  To decide whether the defendant intended to commit theft, please refer to the separate instructions that I give you on those crimes.  Burglary was committed if the defendant entered with the intent to commit theft.  The People allege that the defendant intended to commit theft.  You may not find the defendant guilty of burglary unless you all agree that he intended to commit theft at the time of the entry."

"To prove that the defendant committed theft the People must prove beyond a reasonable doubt that, one, the defendant took possession of property owned by someone else, two, the defendant took the property without the owner's consent, three, the defendant took the property he intended – when the defendant took the property he intended to deprive the ·owner of it permanently and, four, the defendant moved the property even a small distance and kept it for a period of time, however brief.  This property can be of any value, no matter how slight."

"Now, burglary is divided into two degrees.  If you conclude that the defendant committed the burglary, then you ·must decide the degree.  First-degree burglary is the burglary of an inhabited house or room within an inhabited house.  A house is inhabited if someone uses it as a dwelling, whether or not someone is inside at the time of the alleged entry.  A house includes any room that is attached to the house and functionally connected with it.  All other types of burglary are second degree.  [¶]  The People have the burden of proving beyond a reasonable doubt that the burglary was

48.

first-degree burglary. If the People have not met this burden, you must find the ·defendant did not commit first-degree burglary."

### B.    CALCRIM Nos. 730 and 703

Defendant contends the court failed to instruct the jury with two instructions that defined the elements of the felony murder special circumstance based on burglary, and the instructional error was prejudicial and requires reversal.

The court did not instruct the jury with CALCRIM No. 730, which states:

"The defendant is charged with the special circumstance of murder committed while engaged in the commission of [burglary]. [¶] To prove this special circumstance is true, the People must prove that: [¶] 1. The defendant committed or attempted to commit [burglary]; [¶] 2. The defendant intended to commit [burglary]; [¶] 3. The defendant did an act that caused the death of another person. [¶] To decide whether the defendant committed [burglary], please refer to the separate instructions that I have given you on that crime. You must apply those instructions when you decide whether the People have proved this special circumstance. [¶] The defendant must have intended to commit the felony of [burglary] before or at the time of the act causing the death. [¶] In addition, in order for the special circumstance to be true, the People must prove that the defendant intended to commit [burglary] independent of the killing. If you find the defendant only intended to commit murder and the commission of the [burglary] was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved."

Defendant also argues the court should have given CALCRIM No. 703, which addresses the felony murder special circumstance based on burglary when the charged party was not the actual killer but an aider and abettor.

### C.    The Special-circumstance Instructions

"Once the jury finds the defendant has committed first degree murder, the felony-murder special circumstance applies if the murder was committed during the commission or attempted commission of a statutorily enumerated felony, and subjects the defendant to a sentence of death or of life without the possibility of parole. [Citation.]" (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80; § 190.2, subd. (a)(17).) Burglary is an enumerated felony. (§ 190.2, subd. (a)(17)(G).) The

elements of the special-circumstance allegation are similar to those of the felony-murder doctrine.  (3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2019) Punishment, § 532, pp. 853–854.)

A trial court has a sua sponte duty to instruct the jury on the essential elements of each charged offense or special circumstance allegation.  (*People v. Merritt* (2017) 2 Cal.5th 819, 824; *People v. Mil* (2012) 53 Cal.4th 400, 409; *People v. Williams* (1997) 16 Cal.4th 635, 689.)  The court also has a sua sponte duty to instruct on the elements of any underlying felonies alleged.  (*People v. Cain* (1995) 10 Cal.4th 1, 36.)

A criminal defendant has the right to a jury determination that the defendant is guilty of every element of the crimes charged beyond a reasonable doubt, and the court must instruct the jury on the essential elements of the charged offenses and any special circumstances.  (*People v. Merritt*, *supra*, 2 Cal.5th at p. 824.)  The class of structural errors requiring reversal per se is limited, and only an instructional error or omission that amounts to a total deprivation of a jury trial is structural error, such as where the jury is given a defective reasonable doubt instruction.  (*Id.* at pp. 822, 826, 829–830.)  Otherwise, a failure to instruct on elements of a crime does not require reversal if it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.  (*Id.* at pp. 822, 831; *People v. Rivera* (2019) 7 Cal.5th 306, 332–333; *People v. Mil*, *supra*, 53 Cal.4th at p. 409; *People v. Williams*, *supra*, 16 Cal.4th at p. 689.)  Even the extreme case of a trial court's complete failure to instruct on a charged offense or special circumstance is subject to harmless error analysis.  (*Merritt*, at p. 821.)

In evaluating the prejudicial effect of an instructional error, " '[t]he critical inquiry, in our view, is not the *number* of omitted elements but the *nature* of the issues removed from the jury's consideration.  Where the effect of the omission can be "quantitatively assessed" in the context of the entire record (and does not otherwise qualify as structural error), the failure to instruct on one or more elements is mere " 'trial

error" ' and thus amenable to harmless error review.  [Citation.]'  [Citation.]"  (*People v. Merritt*, *supra*, 2 Cal.5th at p. 828, italics in original.)

We review claims of instructional error de novo. (*People v. Rivera, supra,* 7 Cal.5th at p. 326.)

### 1.    Analysis

We find the court's failure to give CALCRIM No. 730 on the elements of the felony murder special circumstance based on burglary was harmless beyond a reasonable doubt.  While the court failed to instruct on the special circumstance, the jury received CALCRIM No. 540A on the elements of felony murder based on burglary.  As in CALCRIM No. 730, the jury was instructed in CALCRIM No. 540A that the People had the burden to prove beyond a reasonable doubt that defendant committed residential burglary, defendant intended to commit residential burglary, he caused the death of another person while committing residential burglary, and he must have intended to commit the felony of residential burglary before or at the time that he caused the death of another person.  The jury was also fully instructed on the elements of residential burglary and theft.  The jury was thus instructed with the functional equivalent of CALCRIM No. 730, and the failure to give that instruction was harmless beyond a reasonable doubt.

Defendant further argues the court should have given CALCRIM No. 703 on the special circumstance for felony murder based on accomplice liability since it had already instructed the jury with CALCRIM No. 540B on accomplice liability for felony murder.

The court has a sua sponte duty to instruct on accomplice liability when a special circumstance is charged and there is sufficient evidence to support the finding that the defendant was not the actual killer, regardless of the prosecution's theory of the case. (*People v. Jones* (2003) 30 Cal.4th 1084, 1117.)  In this case, however, there was no evidence that supported any instructions on aiding or abetting, or accomplice liability for felony murder.  The jury was presented with evidence of two vastly different scenarios: that defendant was either the lone killer, consistent with the People's evidence, or an

51.

unknown person killed Rodriguez during the brief time defendant left the house, based on defendant's trial testimony. While the court gave CALCRIM No. 540B, it also instructed the jury with CALCRIM No. 200, that some of the instructions "may not apply" and not to assume "just because I give a particular instruction that I am in any way suggesting anything about the facts or findings you are to make." "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) The jury was thus instructed to disregard the accomplice instructions that were given since there was no evidence to support that theory.

While the court had a sua sponte duty to give CALCRIM No. 730 on the felony murder special circumstance, there was no evidence to support CALCRIM No. 703 on accomplice liability for that same special circumstance. As a result, the court's failure to give CALCRIM No. 703 was not error.

## III. Constitutional Claim

Defendant raises a separate issue that if the failure to give CALCRIM No. 730 on the special circumstance was harmless error because the jury received CALCRIM No. 540A on felony murder, such a conclusion means that the special circumstance fails to narrow the class of defendants eligible for life without the possibility of parole as required by the federal and state constitutions.

Defendant concedes the California Supreme Court has rejected this argument. (*People v. Stevens* (2007) 41 Cal.4th 182, 204; *People v. Abilez* (2007) 41 Cal.4th 472, 509; *People v. Koontz* (2002) 27 Cal.4th 1041, 1095; *People v. Catlin* (2001) 26 Cal.4th 81, 157-158.) Defendant acknowledges this court is bound by those rulings (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450) but urges this court to reexamine this issue.

We are bound by and agree with the California Supreme Court's rulings and note defendant's preservation of this issue for further review.

**IV. CALCRIM No. 376**

The jury was instructed with CALCRIM No. 376 as follows:

"If you conclude that the defendant knew he possessed property and you conclude that that property had in fact been ·recently stolen, you may not find the defendant – you may not find the defendant – that the defendant committed ·burglary based on those facts alone.  However, if you find that the supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed burglary.  The supporting evidence need only be slight and need not be enough by itself to prove guilt.  You may consider how, where, and when the defendant possessed the property along with any other relevant circumstances tending to prove he committed burglary.

"Remember that you may not convict the defendant of any ·crime unless you are convinced that each fact essential to that conclusion that the defendant is guilty of that crime has been committed – has been proved beyond a reasonable doubt."

Defendant argues this instruction undermined his defense theory that he never intended to steal anything, it impermissibly diluted the prosecution's burden of proof by allowing the jury to rely on "slight evidence" to infer that he had the requisite intent to steal based on possession of recently stolen property, it allowed the jury to convict him on proof less than beyond a reasonable doubt, and resulted in his conviction without the jury having to determine the credibility of his testimony about how he ended up with Rodriguez's property that had little or no value.

A series of cases have repeatedly approved CALCRIM No. 376 (and its predecessor CALJIC No. 2.15) as constitutional, including the "slight evidence" language, and found the instruction does not contain an improper inference or reduce the People's burden of proof.  (*People v. Potts* (2019) 6 Cal.5th 1012, 1042–1043; *People v. Grimes* (2016) 1 Cal.5th 698, 730; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1350–1351; *People v. Lopez* (2011) 198 Cal.App.4th 698, 708–712; *People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574–1577.)

Defendant argues that while the instruction has been approved in other contexts, it was improper in this case because his recent possession of stolen property "did not logically support the inference he had that intent *when he entered Rodriguez's home*, the essential element of the charged felony-murder." (Italics in original.) As we have repeatedly explained, however, defendant was not required to have the intent to steal when he initially entered Rodriguez's house. While he had previously been invited into Rodriguez's house, and he entered with permission on the day of the murder, that did not mean he was incapable of forming the intent to steal after he entered the house and before he entered one of the rooms to steal property. There is strong circumstantial evidence that he had the intent to steal when he later walked into the backroom/workshop and took Rodriguez's property, including the hammer that he then used to kill Rodriguez.

## V.     Parole Revocation Fine

Defendant contends and the People agree that the court improperly imposed and stayed a $4,000 parole revocation fine pursuant to section 1202.45, since defendant was sentenced to life in prison without possibility of parole. The fine must be stricken.

## DISPOSITION

The trial court's order that imposed and stayed a parole revocation fine of $4,000 is ordered stricken. In all other respects, the judgment is affirmed.

POOCHIGIAN, J.

WE CONCUR:

HILL, P.J.

SMITH, J.

55.